STATE of Utah, Plaintiff and Respondent,

v.

Marc Francis SCHREUDER, Defendant and Appellant.

No. 18735.

Supreme Court of Utah.

Dec. 27, 1985.

Walter Bugden, Salt Lake City, R. Paul Van Dam, Robert B. Denton, Cahoon Mansion, Murray, for defendant and appellant.

David L. Wilkinson, Atty. Gen., Earl F. Dorius, Asst. Atty. Gen., Ernest W. Jones, Deputy Co. Atty., Salt Lake City, for plaintiff and respondent.

DURHAM, Justice:

The defendant was convicted of murder in the second degree for shooting and killing his grandfather, Franklin Bradshaw, on July 23, 1978, when the defendant was seventeen years old. The defendant was sentenced to a term of five years to life in the Utah State Prison and fined $10,000. The trial court applied U.C.A., 1953, § 76-3-203, the firearm enhancement statute, and sentenced the defendant to separate terms of one year and up to five years, each term to run consecutively with the other portions of the sentence. The defendant has raised ten separate issues for consideration on appeal. Those issues relate to the preliminary hearing, the pretrial stage of the prosecution, the errors alleged at trial, and the post-trial imposition of sentence. After summarizing the evidentiary and procedural facts, we will deal separately with the issues in each of the foregoing categories.

During the trial, the defendant admitted killing his grandfather. He maintained that he should be convicted only of manslaughter because he was under extreme mental and emotional disturbance due to his relationship with his mother and her pressure on him to commit the murder. The defendant testified that his mother, Frances Schreuder, feared that the victim, Franklin Bradshaw, would disinherit her and her family. The evidence showed that the defendant purchased a .357 magnum pistol in Midland, Texas, on July 22, 1978, flew to Salt Lake City the same day, and

shot his grandfather on July 23, 1978, at 8:30 a.m.

Richard Behrens, a resident of New York and an acquaintance of the Schreuder family, testified that Frances Schreuder had asked him several times for the name of a person who would kill her father, Franklin Bradshaw, for a fee. Behrens also testified that the defendant had told him that he had killed his grandfather at Mrs. Schreuder's insistence and that the defendant had described the manner of the killing and told him that he had brought the gun back to his mother in New York. According to Behrens' testimony, Frances Schreuder gave the gun to him and he subsequently delivered it to Marilyn Reagan, Mrs. Schreuder's sister, who eventually delivered it to the New York City police.

The foregoing testimony was given by Behrens at the preliminary hearing and again at trial. In December of 1980, however, after the preliminary hearing and before trial, Behrens made two sworn statements that Marilyn Reagan had killed Bradshaw and that she had kept the gun all along. Behrens said at trial that these statements were untrue and that he had given them to the defendant's attorneys because he had been frightened by statements made to him by Frances Schreuder indicating that he was an accessory to murder because he had concealed the gun. After Utah prosecutors brought charges against Behrens for obstructing justice, Behrens returned to his original story as told at the preliminary hearing.

The New York City police delivered the gun to the police in Salt Lake City, who in turn delivered it, together with two bullets taken from Franklin Bradshaw's body, to a ballistics expert named Peterson in California. Peterson test-fired the gun and compared the markings on the test bullet with those on the bullets taken from the body. He testified at the preliminary hearing and at trial that the striations on one of the bullets taken from the body matched those on the test bullet. His testimony was inconclusive as to the other bullet.

## I. ISSUES RELATING TO THE PRELIMINARY HEARING

The defendant has raised three issues relating to his preliminary hearing: (1) did the district court have jurisdiction to conduct the preliminary hearing? (2) were the defendant's due process and confrontation rights violated by the admission of the opinion testimony of the ballistic expert at the preliminary hearing? and (3) was the defendant deprived of equal protection of the law by virtue of being unable to seek review in a superior court of the bind-over ruling after the preliminary hearing in district court?

**A.** *Jurisdiction of the district court to conduct a preliminary hearing.* Because the defendant was seventeen years old at the time of the murder, a certification hearing was held in juvenile court to determine whether it should retain jurisdiction. The juvenile court ruled, pursuant to U.C.A., 1953, § 78–3a–25(1), that the defendant should be tried as an adult and certified the case to the district court. The statute provides that once a case is certified from juvenile court to district court, the child is to "be held for criminal proceedings ... with a hearing before a committing magistrate to be held as in other felony cases." U.C.A., 1953, § 78–3a–25(1). A preliminary hearing was held by a district court judge sitting as a committing magistrate in March of 1982.

The defendant claims that the district court judge was without authority to act as a committing magistrate because such a procedure violates the requirement of the statute that the hearing be "held as in other felony cases." In other felony cases, preliminary hearings are conducted in circuit court. He also relies on the language of section 78–3a–25(9) (1977), which states that the juvenile court shall regain jurisdiction over a juvenile whose case is in the adult system when "[a] magistrate of the circuit court determines that there is insufficient probable cause for the juvenile to stand trial on the allegation or amended allegations...." The defendant claims that the reference to a circuit court judge

makes it clear that the statute contemplates that preliminary hearings in certified cases must be conducted in the circuit court. While we agree that the language cited supports the defendant's position, we do not agree that this indirect statutory reference constitutes a jurisdictional mandate. The general provisions contained in section 77–35–7 governing proceedings before magistrates do not preclude district court judges from sitting as magistrates. There is only one phrase contained in section 77–35–7(d)(3) that even refers to any of the courts. It says, "If the magistrate orders the defendant bound over to the district court, the magistrate shall execute in writing a bind-over order and shall forthwith transmit to the clerk of the district court all pleadings in and records made of the proceedings before the magistrate...." Again, while the statute implies that magistrates will ordinarily sit in courts other than the district court, it does not contain any jurisdictional limitations.

Furthermore, we are not inclined to read into any of the above statutes a jurisdictional limitation that is not explicit. In the definitional section of the Utah Code of Criminal Procedure, U.C.A., 1953, § 77–1–3, "magistrate" is specifically defined as "a justice of the supreme court, a judge of the district courts, a judge of the juvenile courts, a judge of the circuit courts and a justice of the peace or a judge of any court created by law...." There is no indication that the use of the term "magistrate" in section 77–35–7 has a fundamental definition that is more narrow than that applicable in. the rest of the Code. Section 78–4–5 (Supp.1985) refers to some of the powers of a magistrate. In specifying that circuit court judges may exercise those powers, section 78–4–5 provides:

> The judge of the circuit court shall have and exercise the powers and jurisdiction of a magistrate, including proceedings for the preliminary examination to determine probable cause....

The foregoing language, in conjunction with the statutory definition of the term "magistrate," makes it clear that circuit court judges do not have exclusive jurisdic-

tion to conduct preliminary examinations. Whether the statutes intended that preliminary examinations in cases involving juveniles certified for trial as adults be conducted in the circuit courts rather than in the district courts is uncertain, since the statutes contain several ambiguities. But there can be no uncertainty about the fundamental jurisdiction of a district court judge to sit as a magistrate and conduct a preliminary examination for purposes of determining probable cause for a bind-over for trial on felony charges. We believe that the language of U.C.A., 1953, § 78–3–4 is conclusive on that issue: "The district court shall have original jurisdiction *in all matters civil and criminal,* not excepted in the Constitution and not prohibited by law...." (Emphasis added.) Thus the circuit and district courts have concurrent jurisdiction to conduct preliminary hearings.

*B. Admission of expert ballistics testimony at the preliminary hearing.* The defendant objected at the preliminary hearing to the admission of the opinion testimony of the ballistics expert on the ground that there was inadequate foundation to permit proper cross-examination. Peterson, a ballistics expert with the Federal Bureau of Alcohol, Tobacco & Firearms, testified that he had compared a bullet fired from the alleged murder weapon with bullets taken from the body of Franklin Bradshaw, the victim. Peterson testified that his comparison showed that the test bullet and one of the other bullets matched in their caliber and in the striations created by the passage of the bullets through the gun barrel. Peterson then stated that in his opinion the match indicated that the two bullets were fired by the same gun. Peterson was, however, unable at the preliminary hearing to give an exact description of the striations, nor did he have photographs of them available with him in court.

Peterson's testimony was properly admitted at the preliminary hearing if that testimony was permissible under the then-applicable provisions of the Utah Rules of Evidence and if the admission of the testimony

did not in any way infringe upon the defendant's constitutional right to be confronted by the witnesses against him. The Utah statute governing preliminary hearings requires that the rules of evidence for trial of criminal cases be applied to preliminary examinations, with the exception of certain hearsay evidence. U.C.A., 1953, § 77–35–7(d)(1). The defendant claims that the admission of Peterson's opinion testimony violated Rule 56(2) of the Utah Rules of Evidence. That rule states:

> If the witness is testifying as an expert, testimony of the witness in the form of opinion or inferences is limited to such opinions as the judge finds are (a) based on facts or data perceived by or personally known or made known to the witness at the hearing and (b) within the scope of the special knowledge, skill, experience or training possessed by the witness.

There is no question that Peterson's testimony was within the scope of his special knowledge as a ballistics expert, and the defendant does not claim otherwise. Furthermore, the court found that Peterson's opinion was based on facts perceived by or personally known to the witness, a finding supported by the evidence.

The defendant argues that Peterson's failure to produce photographs of the bullets examined or to give a description of the striations on the bullets constituted a violation of Rule 56(2) because it constituted a failure to present the facts upon which the expert's opinion was based. Although there are no Utah cases concerning foundational requirements for ballistics testimony, this Court has dealt with such requirements for other types of expert testimony. *See State v. Lairby*, Utah, 699 P.2d 1187, 1200–01 (1984) (opinion testimony of child abuse expert); *Edwards v. Didericksen*, Utah, 597 P.2d 1328, 1330–31 (1979) (opinion of police officer as to cause of accident he investigated); *Day v. Lorenzo Smith & Son, Inc.*, 17 Utah 2d 221, 408 P.2d 186 (1965). In *Day*, this Court considered the admission of an opinion from an expert in accident reconstruction and approved it *"when a proper foundation for the opinion has been laid."* 17 Utah 2d at 223, 408

P.2d at 189. (Emphasis in original.) The Court in that case determined that the expert had not observed the actual impact and that his opinion of the precise point of impact therefore had to be based upon facts derived from his investigation. The Court then found that it was error to admit the opinion, because it was not based on facts personally known to the expert. The circumstances in this case are different from *Day* for two reasons. First, Peterson's opinion that the two bullets were fired from the same gun was based on his personal observations of the marks on the two bullets, rather than upon a review of second-hand data. Second, Peterson's opinion was supported by facts relating directly to the opinion—he saw the two bullets together and was therefore able to form an opinion based on personal knowledge.

Cases in other jurisdictions generally support the admissibility of expert testimony of ballistics tests without photographs. *See, e.g., Commonwealth v. Ellis*, 373 Mass. 1, 364 N.E.2d 808, 812 (1977) (expert ballistics testimony admissible although not accompanied by comparison photographs); *State v. White*, La., 321 So.2d 491, 496 (1975) (comparison photographs not required); *People v. Buckowski*, 37 Cal.2d 629, 233 P.2d 912, 913 (1951) (oral testimony without photographs sufficient for opinion of ballistics expert). Peterson's inability at preliminary hearing to remember the exact nature of the striations would not require the exclusion of the evidence in most other jurisdictions, the general rule being that uncertainty on the part of an expert goes to weight rather than to admissibility. *Shurtleff v. Jay Tuft & Co.*, Utah, 622 P.2d 1168, 1173 (1980) (opinion that machine is improperly maintained without foundation of specific acts of abuse permitted with the jury to decide what weight it deserved); *Willard v. State*, Alaska App., 662 P.2d 971, 974–75 (1983) (fact that expert couldn't remember if he personally had performed medical test goes to weight, not admissibility); *State v. Kelly*, 111 Ariz. 181, 187–88, 526 P.2d 720, 727 (1974), *cert. denied*, 420 U.S. 935, 95 S.Ct. 1143, 43

L.Ed.2d 411 (1975) (lack of exactness in expert testimony linking defendant's shoe with footprint goes to weight, not admissibility); *State v. Wasinger,* 220 Kan. 599, 605, 556 P.2d 189, 194 (1976) (inability of police expert to identify positively a screwdriver as the item which made marks at the scene of an attempted burglary affected weight, not admissibility).

■ The defendant's position is that he was denied the right guaranteed to him by the Utah Constitution to confront witnesses against him because he could not effectively cross-examine Peterson without access to photographs or a specific description of the similarities between the two bullets to which Peterson testified. The defendant mistakenly relies on *State v. Anderson,* Utah, 612 P.2d 778 (1980). *Anderson* held that the Utah Constitution's right to confrontation was violated when the prosecution in a criminal case based its showing of probable cause on hearsay evidence. *Id.* at 786. In the instant case, however, the defendant was able to attack the credibility of the witness and the strength of his testimony. As the *Anderson* opinion notes:

> The prosecution is not required to introduce its entire case at the hearing but, rather, need only introduce that quantum of evidence necessary to surmount [its] burden of proving probable cause. The recognition of the right of confrontation at the preliminary examination merely demands [that] the prosecution's use of hearsay at the hearing may not circumvent the defendant's substantive rights to a fair hearing and a fair trial, by denying the defendant an opportunity to cross-examine the witnesses who offer testimony at the hearing.

612 P.2d at 786.

In this case, the defendant was not denied the opportunity to cross-examine Peterson. *Anderson* must be distinguished from the instant case because the evidence offered in *Anderson* was clearly inadmissible at trial. Here, the defendant's objections go to the weight of the evidence, not to its admissibility. The State properly met its burden of showing probable cause at the preliminary hearing and did so with competent, admissible evidence.

■ *C. Denial of equal protection.* The defendant raises an equal protection argument related to the fact that his preliminary examination was conducted in district court rather than in circuit court, claiming that he has been denied the right to review of the bind-over order by a superior court, a right which is afforded to all adult defendants whose preliminary hearings are conducted in circuit rather than in district court. We treat this argument summarily. Section 77–35–26(b)(3) provides that an appeal may be taken by the defendant "[f]rom an interlocutory order when, upon petition for review, the supreme court decides that such an appeal would be in the interest of justice...." That statute governs all appeals from bind-over orders entered in any court. The defendant had the same right to seek review as does any other criminal defendant, and no equal protection problem arises.

## II. OTHER PRETRIAL ISSUES

The defendant has raised three remaining issues concerning the pretrial stage of the prosecution: (1) was the arrest warrant pursuant to which the defendant was apprehended supported by an adequate probable cause statement? (2) did the State fail to give adequate notice to the defendant in the information that it intended to prosecute him under the firearms enhancement statute? and (3) was the certification hearing in juvenile court held in the defendant's absence constitutional?

■ *A. Probable cause statement in the arrest warrant.* The defendant challenges the adequacy of the probable cause statement presented in support of the arrest warrant in this case on the ground that it fails to reveal either the source of the information contained therein or any basis upon which the credibility and reliability of the sources of the information could be judged. Because we are persuaded that any defects in the probable

cause statement would not warrant a reversal of the defendant's conviction, we will, for the purposes of this discussion, assume that the probable cause statement was defective.

The defendant's argument is that, without a valid arrest warrant, the trial court never acquired jurisdiction over him and that his conviction is therefore void. He relies on *State v. Licari*, 153 Conn. 127, 214 A.2d 900 (1965), in which the court characterized the defendant's appeal as an attack on the court's personal jurisdiction over the defendant as opposed to jurisdiction over the subject matter. That case did not involve the adequacy of probable cause statements, since the Connecticut procedure challenged was the issuance of bench warrants unsupported by any oath or affirmation. There are some cases from other jurisdictions that have also sustained attacks on the court's jurisdiction because of invalid arrest warrants or illegal arrests. These cases, however, represent a minority position. A majority of courts have followed "the established rule that illegal arrest or detention does not void a subsequent conviction." *Gerstein v. Pugh*, 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975) (citing *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), and *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886)). This Court followed that line of cases in *State v. Beck*, Utah, 584 P.2d 870 (1978). That opinion states: "The 'probable cause' required for a warrant of arrest, if lacking, may prevent the introduction of illegally seized evidence at the trial, but it does not prevent the trial and conviction of the defendant." *Id.* at 872.

Our examination of the cases that follow *Licari* reveals no persuasive basis for abandoning the majority rule previously followed by this Court. Those cases do not appear to be well reasoned. For example, in a recent Connecticut decision following *Licari*, the court takes a position that appears to be internally inconsistent. The defendant in *State v. Gallegher*, 191 Conn. 433, 465 A.2d 323 (1983), claimed that his arrest was invalid because, among other things, a warrant was not obtained despite the opportunity to do so. The court stated:

We do not reach the merits of these claims. Even if we were to consider them and resolve them in defendant's favor, such a determination would not invalidate the convictions. "An illegal arrest, without more, has never been viewed as a bar to a subsequent prosecution, nor as a defense to a valid conviction." The remedy for an unlawful arrest is the suppression of evidence obtained thereby.

191 Conn. at 438, 465 A.2d at 326 (quoting *United States v. Crews*, 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980) (other citations omitted)). In the next paragraph, however, the court went on to say that "under certain circumstances an unlawful arrest entitles a defendant to dismissal of the charges against him." The court identified those "certain circumstances" as the existence of fourth amendment defects in the arrest warrant. Yet the *Crews* opinion, quoted in *Gallegher*, was in fact predicated on a fourth amendment defect, namely, the detention of the defendant without probable cause. Similar inconsistencies are apparent in the other cases relied upon by the defendant wherein the courts attempt to reconcile the general rule that an illegal arrest does not void a conviction with the theory that a valid arrest warrant constitutes a jurisdictional requirement. *See State v. Korotki*, Del.Super.Ct., 418 A.2d 1008, 1012 (1980); *Walberg v. State*, 73 Wis.2d 448, 455–64, 243 N.W.2d 190, 194–98 (1976).

In *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), the United States Supreme Court examined the requirements of the fourth amendment in the context of arrest and detention without a judicial determination of probable cause. The Court observed that the probable cause standard "represents a necessary accommodation between the individual's right to liberty and the State's duty to control crime." *Id.* at 112, 95 S.Ct. at 862. The Court further stated: "The Fourth Amendment probable cause determination is addressed only to pretrial custody," *id.* at

123, 95 S.Ct. at 867, and "[w]hatever procedure a State may adopt, it must provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, and this determination must be made by a judicial officer either before or promptly after arrest." *Id.* at 124–25, 95 S.Ct. at 868 (footnotes omitted). In a related footnote, the Court pointed out that "the Fourth Amendment probable cause determination is in fact only the *first* stage of an elaborate system, unique in jurisprudence, designed to safeguard the rights of those accused of criminal conduct." *Id.* at 125 n. 27, 95 S.Ct. at 869 n. 27 (emphasis in original). The Court was explicit, however, that an

> illegal arrest or detention does not void a subsequent conviction. *Frisbie v. Collins,* 342 U.S. 519 [72 S.Ct. 509, 96 L.Ed. 541] (1952); *Ker v. Illinois,* 119 U.S. 436 [7 S.Ct. 225, 30 L.Ed. 421] (1886). Thus, ... although a suspect who is presently detained may challenge the probable cause for that confinement, a conviction will not be vacated on the ground that a defendant was detained pending trial without a determination of probable cause.

*Id.* at 119, 95 S.Ct. at 865 (other citations omitted).

In *Gerstein,* the Court viewed the probable cause requirement for arrest warrants as a protection against illegal detention. Therefore, once the risk of illegal detention has dissipated, i.e., by the time a trial has been held, the protection is no longer relevant or necessary because other constitutional safeguards have come into play. Under this analysis, the probable cause requirement for an arrest warrant becomes moot by the time a defendant has been convicted because the much more stringent requirements of proof at trial have been employed to protect the defendant.

We are convinced that the "protection" analysis employed by the Supreme Court in *Gerstein* is valid, and we reject the position that the probable cause requirement for arrest warrants is jurisdictional. We note that the only prejudice to the defendant

resulting from what may have been an invalid arrest was that period of detention he experienced prior to preliminary examination and judicial determination of probable cause for trial. In light of his subsequent conviction, that temporary period of possibly wrongful detention is of minimal significance and does not warrant reversal of an otherwise valid conviction.

■ *B. Failure to notify defendant of reliance on the firearms enhancement provision.* The defendant claims that the State's amended information failed to notify him adequately of its intention to rely on the firearms enhancement provision of U.C.A., 1953, § 76–3–203(1). He points out that the charging portion of the information contains no allegations regarding the use of a firearm and does not cite or refer to the statute. The probable cause statement, however, was made a part of the amended information, a one-page document, and is found immediately below the portion of the information which contains the statutory charge of first degree murder. The first sentence of that statement reads: "The victim, Franklin Bradshaw, was shot in the back and in the head by a weapon, determined to be a .357 magnum."

We note that section 77–35–4(b) of the Utah Rules of Criminal Procedure states that an "information may *contain* or be accompanied by a statement of facts sufficient to make out probable cause to sustain the offense charged where appropriate." (Emphasis added.) It is clear from our examination that the one-page amended information filed in this case in fact "contains" the probable cause statement and that the contents of that statement are therefore part of the information.

The defendant relies upon *State v. Angus,* Utah, 581 P.2d 992 (1978), and we agree that *Angus* is controlling. We reject, however, the defendant's contention that *Angus* requires the relief he seeks. In *Angus,* the defendant argued that the information should have recited the statutory enhancement of penalty if the State intended to seek it. This Court said:

We have no disagreement with the proposition that fairness and due process of law require that the information against him be sufficient to clearly state the charge and bring him within the operation of the statutory penalty therefor. But his argument that the information must specifically set forth that the enhancement of penalty would be imposed if he was convicted is without merit. The punishment for a crime is not and has never been considered a part of the pleading charging a crime. The information is sufficient if it alleges *either:* (1) that the defendant is being charged under the enhancement statute, *or* (2) that a firearm was used in the commission of the offense charged in the information. *Id.* at 995 (footnotes omitted; emphasis added).

The defendant urges us to construe *Angus* to require that an allegation that a firearm was used appear in what he terms the "charging" portion of the information. By charging portion, he presumably refers to the section of the information which contains a description of the statutory charge. While such a technical requirement might be appropriate with respect to the elements of a crime of which the State seeks to convict a defendant, we see no purpose to be served in applying it to an element of *punishment.* The requirements of *Angus* and constitutional due process are satisfied so long as a defendant is given written notice on the face of an information that the State intends to show a crime was committed with the use of a firearm.

■ *C. Constitutionality of certification hearing.* The question of whether the defendant's right to due process was violated by the juvenile court in conducting a certification hearing while the defendant was voluntarily absent from the jurisdiction was decided by this Court in *In Re Schreuder,* Utah, 649 P.2d 19 (1982). That issue is therefore *res judicata,* and we will not consider it in this appeal.

## III.  TRIAL ISSUES

Three issues relating to the trial of this case are identified by the defendant on appeal: (1) did the trial court commit reversible error in refusing to issue a certificate to secure the attendance of Frances Schreuder as a witness at the trial?  (2) was the defendant's right to a fair trial violated by the prosecution's failure to disclose to defense counsel the contents of conversations with Richard Behrens?  and (3) did the trial court improperly shift to the defendant the burden of proof on the existence of extreme mental or emotional disturbance, thereby violating the defendant's due process rights?

■ *A. The failure to issue a certificate for attendance.* The defendant contends that the trial court's refusal to issue a certificate to secure the attendance of an out-of-state witness from New York (his mother, Frances Schreuder) was a violation of his right to compulsory process under the sixth amendment of the federal constitution and article I, section 12 of the Utah Constitution.

Section 77–21–3 of the Utah Code provides, in substance, that when a material witness in a prosecution in Utah is in a state with procedures for permitting enforcement of process, the Utah courts may issue a certificate requesting the foreign state to ensure the attendance of the witness at trial.  The state of New York has reciprocal provisions for honoring such a request from the Utah courts and compelling a material witness in New York to attend and testify at trial in this state.  On June 12, 1982, the defendant petitioned the trial court to issue a certificate to secure the attendance of Frances Schreuder at the trial to testify on his behalf.  The defendant represented that he expected Frances Schreuder's testimony to support an insanity defense and that she would testify about mitigating factors at the penalty phase of the trial should the defendant be convicted of capital murder.  The defendant also expected that Mrs. Schreuder would be asked to testify generally about the character and credibility of Richard Behrens, the key

prosecution witness, and to controvert allegations made by Behrens that Mrs. Schreuder had coerced Behrens into changing his account of who killed Franklin Bradshaw.

Upon these representations, the trial court initially agreed to issue a certificate requesting that the New York courts compel Frances Schreuder to appear in Utah to testify on behalf of the defendant at the guilt and penalty phases of the trial. The next day, however, the court reversed its decision and agreed to issue the certificate for the penalty phase only. The trial court expressed concern about Frances Schreuder's fifth amendment right against self-incrimination and noted that she could not be compelled to testify against her will and that defense counsel could not ethically call her to the stand knowing that she would invoke her privilege. Because he believed Mrs. Schreuder might not testify if called, the trial judge questioned whether she was a "material" witness within the meaning of the statute on compulsory attendance. The trial court therefore agreed to issue the certificate for the guilt phase of the trial only if the defendant's attorneys could secure assurances from Mrs. Schreuder or her attorneys that she would not invoke her fifth amendment privilege when asked about Behrens' character and his assertion that she had coerced him into changing his testimony.

We find that the trial court's concern about Frances Schreuder's fifth amendment rights was premature.

The Fifth Amendment privilege against self-incrimination "... comes into operation only where a specific question is asked." ... Moreover, "[a]n attorney for a witness cannot claim a privilege against self-incrimination; he can only advise the witness. In order for the claim to be honored by the court, it must be made by the witness."

*State v. White*, Utah, 671 P.2d 191, 193 (1983) (quoting *State in Interest of P.L.L.*, Utah, 597 P.2d 886, 889 (1979), and *State v. Anderson*, 27 Utah 2d 276, 279, 495 P.2d 804, 806 (1972) (other citations omitted)). Furthermore, a lawyer conducts himself unprofessionally only when he calls a witness to testify who he knows will claim a valid privilege not to testify for the purpose of impressing upon a jury the fact that the privilege is being claimed. *Id.* at 193. There would have been no unethical conduct if the defendant's attorneys had merely called Mrs. Schreuder to testify under oath before the trial judge about her intentions regarding the privilege. Until she had personally invoked her privilege not to testify, the fifth amendment did not constitute a legitimate reason to consider her a nonmaterial witness for purposes of issuing a certificate to compel her attendance at trial.

■ Nevertheless, other considerations dealing with the question of materiality remain. Failure to demonstrate materiality as required by the statute is a basis for affirming the trial court's ruling, even though our analysis of materiality may differ from that of the trial court. *See, e.g., State v. Tindall*, 294 N.C. 689, 698–700, 242 S.E.2d 806, 811–12 (1978); *State v. Smith*, 87 N.J.Super. 98, 104–05, 208 A.2d 171, 174–75 (1965).

■ The sixth amendment to the federal constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor...." In *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), the United States Supreme Court found a violation of this guarantee where the defendant had been arbitrarily deprived of "testimony [that] would have been *relevant and material, and ... vital to the defense." Id.* at 16, 87 S.Ct. at 1922 (emphasis added). In *United States v. Valenzuela-Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), the Supreme Court reasoned that the language of the sixth amendment and of *Washington* suggested that a criminal defendant, in order to establish a violation of his constitutional right to compulsory process, must make some plausible showing that the testimony of the absent witness "would have been both material and favorable to his defense." *Id.* at 873, 102

S.Ct. at 3449 (footnote omitted). Testimony is material, and its exclusion is therefore prejudicial, if there is a reasonable probability that its presence would affect the outcome of the trial. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. 668, ——, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984).

> "The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt.... This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."

*Valenzuela-Bernal,* 458 U.S. at 868, 102 S.Ct. at 3447 (quoting *United States v. Agurs,* 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342 (1976)).

■ At trial, the defendant admitted killing his grandfather, but claimed that he had done so under the direction of his mother, Frances Schreuder. He claimed that his mother's domination of him was so great and that the resulting emotional and psychological stress was so severe that he should be found guilty of manslaughter rather than first degree murder. In the context of this strategy, we cannot conceive of any effect on the verdict resulting from testimony from Mrs. Schreuder that she never coerced Behrens into making a false statement or that she knew him to be a person of bad character with a reputation for falsehood. As to the latter matters, Mr. Behrens' character and veracity were significantly undermined by his own testimony about his activities, dealings with the Schreuders, previous false statements, and changes in sworn testimony. Precisely what motivated Behrens to make his statement that Marilyn Reagan had killed Bradshaw might have had some relevance if the defense had attempted to show that someone other than the defendant did the killing. Yet the defendant had already admitted that he killed his grandfather. Mrs. Schreuder's testimony that she did not coerce Behrens into making a false statement would not have aided and would probably have undermined the defendant's position that his responsibility for the killing was diminished by his mother's control and domination over him. If Behrens' claim of coercion by Mrs. Schreuder was believed by the finder of fact, it is likely that Behrens' testimony helped the defendant's case by characterizing his mother as an aggressive, manipulating, and controlling person. We therefore conclude that the testimony from Frances Schreuder anticipated by the defendant was not material to his case and that the trial judge's failure to compel her attendance did not violate the sixth amendment.

Article I, section 12 of the Utah Constitution guarantees to a criminal defendant the right "to have compulsory process to compel the attendance of witnesses in *his own behalf.*" (Emphasis added.) This language differs slightly from the confrontation clause of the federal constitution, which refers to the obtaining of witnesses "in his favor" by a criminal defendant. Neither the defendant nor the State has made any argument or cited any authority supporting an interpretation of the Utah clause that differs from that given the federal language. Therefore, we do not treat that question separately, and we rely upon our analysis under the federal right to compulsory process.

■ *B. Failure to disclose Behrens' conversations.* In an analytically related issue, the defendant contends that the State disobeyed a discovery order when it failed to disclose before trial the notes that a police investigator took of two conversations with Richard Behrens. The defendant does not state what relief would be appropriate; he only claims that the information contained in the notes "might have had great impact on the outcome of the case."

It appears that the prosecution should have disclosed the existence and contents of the notes. Assuming that to be the case, however, we are unable to see how the defendant was harmed by the prosecution's failure to disclose. He discovered the existence of the notes at trial, but did not then request that they be turned over to the defense, thereby giving the trial court an opportunity to avoid or mitigate any damage that the nondisclosure of the notes may have caused. We are not inclined to accept his assessment on appeal that the notes had great significance to the defense when the defendant did not even request to see them once their existence had been disclosed.

Furthermore, the defendant has not described how these notes could have affected the outcome of his trial. In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is *material* ... to guilt ... irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196 (emphasis added). *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), emphasized the materiality element when it stated that a criminal defendant will prevail on a *Brady* claim "where the evidence is favorable to the accused and is material either to guilt or to punishment." *Id.* at 794, 92 S.Ct. at 2568. The materiality of evidence is, as we have indicated, determined by the reasonable probability that it would affect the outcome of the trial. The defendant has not even attempted to establish *how* the notes would have affected the verdict. Therefore, any error on the part of the prosecution was harmless.

■ *C. The burden of proof on mental or emotional disturbance.* The defendant's final contention concerning the trial is that a statement made by the trial judge in announcing his verdict indicates that the defendant had been improperly required to prove that in killing his grand-father he had acted "under the influence of extreme mental or emotional disturbance for which there is a reasonable excuse...." U.C.A., 1953, § 76–5–205(1)(b) (statutory definition of manslaughter). The statement on which the defendant bases this argument is as follows: "The court *finds* that the defendant did not cause the death of Franklin Bradshaw while under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation or excuse." (Emphasis added by the defendant.) The defendant claims that this statement shows that he was required by the trial judge to prove this fact rather than merely to raise a reasonable doubt regarding its existence. The defendant's logic is specious. The trial court's statement merely constitutes a finding that the State had rebutted the defendant's position on mental or emotional disturbance and had proved intent beyond a reasonable doubt. This reading is consistent with the entire verdict read as a whole, and we see no evidence therein that the trial court improperly shifted the burden of proof to the defendant.

### IV. POST–TRIAL ISSUE

■ The defendant's final argument on appeal is that the trial court committed constitutional error and abused its discretion in failing to give him credit on his sentence for the period of time he was incarcerated prior to trial. The defendant was originally granted bail on December 18, 1981, prior to his preliminary hearing. Bail was revoked on March 3, 1982, after he failed to appear for a court-ordered line-up. After conviction, the defendant was sentenced by the trial court to a statutory indeterminate term of five years to life. Because a firearm was used in the killing, the defendant was also sentenced to an additional one-year term to run consecutively and an indeterminate term of up to five years, also to run consecutively, pursuant to U.C.A., 1953, § 76–3–203(1). After the imposition of sentence, the defendant requested the trial court to order that credit be given for the period of time he spent in pretrial de-

 

tention. He has not suggested in his brief the source of any authority for a trial court to order what is in effect a modification of a statutory sentence. Section 76-3-201 gives courts the power to impose specified sentences "[w]ithin the limits prescribed by this chapter." The reduction the defendant seeks to have implemented by the trial court is outside the limits prescribed and is therefore beyond the court's power.

Once sentence has been imposed by the court, our sentencing system vests almost complete discretion in the Board of Pardons to determine the period of time that will actually be served. Section 76-3-202(5) says: "Nothing in this section shall preclude the board of pardons from paroling or discharging an inmate at any time within the discretion of the board of pardons." That language is certainly adequate to allow the Board to give this defendant credit for his presentence confinement when it decides the length of time he should actually serve pursuant to the sentences imposed on him. We therefore decline to rule on the defendant's constitutional claims for entitlement to credit. His request must be directed to the Board of Pardons. This Court has consistently held that the power to reduce or terminate sentences is exclusive with the Board. *See McCoy v. Harris,* 108 Utah 407, 160 P.2d 721 (1945); *Cardisco v. Davis,* 91 Utah 323, 64 P.2d 216 (1937); *State ex rel. Bishop v. State Board of Corrections,* 16 Utah 478, 52 P. 1090 (1898); *see also Graham v. Thompson,* 246 F.2d 805 (10th Cir. 1957). In *State v. Jaramillo,* 25 Utah 2d 328, 481 P.2d 394 (1971), credit for thirty months was given a prisoner for time served under a vacated sentence, pursuant to *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). The prisoner had been sentenced to a term of five years to life. Pointing out the obvious difficulty of carrying out a sentence of "life minus thirty months," the Court referred the matter to the Board of Pardons, since it had the prisoner's total record and was aware that the time served on the previous sentence should be taken into account in determining his release date. *Id.* 481 P.2d at

395. A similar reference is appropriate here.

The conviction and sentence of the defendant are affirmed.

HOWE, J., and GEORGE E. BALLIF, District Judge, concur.

HALL, C.J., and STEWART, J., concur in the result.

ZIMMERMAN, J., does not participate herein; BALLIF, District Judge, sat.